UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAMON ALEJANDRE, JR.,

      Petitioner,

    v.

P.D. BRAZELTON, Warden,

      Respondent.

_____/

No. C 11-4803 CRB (PR)

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Petitioner Ramon Alejandre, Jr., a state prisoner incarcerated at the California Correctional Institution in Tehachapi, seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging a conviction and sentence from Contra Costa County Superior Court.  In an order dated February 8, 2012, the Court found that the petition stated several cognizable claims for relief and ordered Respondent to show cause why a writ of habeas corpus should not be granted.  Respondent has filed an answer to the order to show cause.  Petitioner did not file a traverse.  For the reasons set forth below, a writ of habeas corpus will be denied.

**PROCEDURAL BACKGROUND**

On June 18, 2008, a jury found Petitioner guilty of first degree murder, with enhancements for benefitting a criminal street gang and discharging a firearm causing great bodily injury (count one); being a felon in possession of a firearm (count two); and conspiracy to commit aggravated assault (count three).  The court found true that Petitioner had a prior serious felony conviction, a prior strike conviction, and a prior prison term.  On

1  July 16, 2008, the court sentenced Petitioner to an aggregate prison term of ninety years to

2  life.  On September 29, 2010, in a written order, the California Court of Appeal affirmed

3  Petitioner's conviction.  People v. Alejandre, 2010 WL 3772369 (Cal. App. September 29,

4  2010) (nonpublished).  On January 12, 2011, the California Supreme Court denied review.

5      On September 28, 2011, Petitioner filed a petition for a writ of habeas corpus in this

6  Court.  On February 8, 2012, the Court issued an Order to Show Cause.  On July 23, 2012,

7  the Court granted Respondent's motion to dismiss the petition as mixed, permitted Petitioner

8  to strike the unexhausted claims, and limited its previous Order to Show Cause to the

9  remaining exhausted claims as set out in Petitioner's state petition for review.

10                         **FACTUAL BACKGROUND**

11      The California Court of Appeal summarized the evidence presented at trial as follows:

12  The account of the murder came largely from two accomplices, Roberto Garcia
   and Juan Vargas. FN2.  At the time of the murder in February 2007, Garcia
13  was 20 and Vargas was 17.  They had been friends for several years.
   Defendant, who was 31 at the time, is Garcia's uncle.  Defendant was a senior
14  Sureño, known as an "OG," "Old Gangster" or "Original Gangster."  Vargas
   was a Sureño but at the time of trial claimed he was no longer a member of the
15  gang.  Garcia had taken steps to become a Sureño, but at the time of trial also
   denied membership in the gang.
16
   FN2 Garcia and Vargas were also initially charged with the murder but agreed to
17  testify against defendant as part of a plea bargain.

18  On the evening of February 2, 2007, defendant, Vargas, and Garcia were
   drinking beer together.  At some point after 9:00 p.m., they went to buy more
19  beer.  Vargas drove Garcia and defendant in his truck as the three continued to
   drink beer in the truck.  As they were driving down 11th Street in San Pablo,
20  someone pointed to a youth walking on the sidewalk wearing red clothing and
   said he was a "chap," a derogatory term for a Norteño, another gang.  At
21  defendant's request, Vargas pulled the car over near the corner of 11th and
   Stanton Streets.  Vargas thought defendant was going to order him to fight the
22  Norteño.  Instead, defendant told Vargas and Garcia to wait in the truck.
   Defendant got out and walked toward the youth.  Worried that defendant would
23  do something to the boy and jeopardize defendant's parole status, Garcia asked
   defendant to come back.  Defendant again told Garcia to wait for him at the
24  truck.  While they were waiting for defendant to return, Garcia took two beer
   bottles from the truck and put them on the curb across the street from the truck.
25  As he was heading back to the truck, Garcia heard several gunshots coming
   from the direction in which defendant had walked.  Vargas heard the shots too
26  and worried that perhaps the youth had shot defendant.  He kept the truck
   idling.  Defendant walked calmly back to the truck and the three drove away.
27  Defendant did not answer when Garcia asked him "why had he did that?"
   None of them spoke of the shooting while in the truck, but later that night
28  defendant told Garcia not to talk about it.  At some point during the drive,

1

2

defendant handed Garcia an empty ammunition clip and told Garcia to hold it for him.

3

Vargas drove to his girlfriend's house where the three men stayed until around midnight, when they returned to the truck. Around 1:00 a.m., they were stopped by the police for a traffic infraction. As the truck was being pulled over, defendant placed his gun on the floor under the bench seat where he was sitting. The officer noticed Vargas had bloodshot, watery eyes, and smelled of alcohol. Vargas admitted to the officer he did not have a driver's license. The officer asked the three men to identify themselves, ran their information, and then asked them to step out of the vehicle. As the officer was taking defendant out of the passenger seat, she noticed the butt of a gun under the seat, directly between defendant's feet. She retrieved the gun, a loaded .45 caliber Springfield semiautomatic pistol, and arrested defendant. She also took custody of the empty clip from Garcia's pocket.

4

5

6

7

8

9

10

11

12

13

14

Around 9:45 p.m., officers responding to a report of a shooting found the 15-year-old victim dead on the sidewalk on 11th Street. He had multiple gunshot wounds and was lying in a large pool of blood. Numerous expended .45 caliber shell casings were found on the sidewalk near the body. A firearms expert examined the expended cartridges and concluded that all had been fired by the .45 caliber gun that had been recovered under defendant's seat. He also testified that six bullets recovered from the scene and from the victim's body matched the brand and make of expended cartridges found around the body. The police also found Garcia's fingerprints on two bottles of beer recovered from the comer of 11th and Stanton Streets.

15

16

Dr. Gregory Reiber, a board certified forensic examiner, described the injuries suffered by the victim and concluded that the victim died as a result of multiple gunshot wounds to his chest.

17

18

Following their arrests, Vargas and Garcia gave taped statements to the police identifying defendant as the shooter. Their taped statements were played to the jury.

19

20

21

The prosecution introduced extensive evidence of defendant's gang activity. One deputy sheriff recounted an incident in jail on August 11, 2007, in which defendant had stated, "I'm a straight Sureño. We get even." Other deputies described another incident in county jail on January 7, 2008, in which they observed defendant assaulting another inmate because, according to defendant, he was a Norteño.

22

23

24

Detective Jeff Palmieri testified as a gang expert. Based on his review of defendant's gang-related criminal history, his statements and actions in jail, his tattoos, and statements he made at prison intake, Palmieri opined that defendant was a Sureño. He also opined that the crime was committed for the benefit of the Sureño gang and was done to build defendant's status within the gang.

25

26

27

Defendant was found guilty of the charged offenses and the enhancements were found true. At a bifurcated court trial, the court found the prior conviction allegations true. Defendant was sentenced to an aggregate prison term of 90 years to life and filed a timely notice of appeal.

28

Alejandre, 2010 WL 3772369, at *1-2

3

**DISCUSSION**

**I.     Standard of Review**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

The only definitive source of clearly established federal law under § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.  Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003), overruled on other grounds by Lockyer  v. Andrade, 538 U.S. 63  (2010).  While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are

United States District Court
For the Northern District of California

1    binding on the state courts and only those holdings need be "reasonably" applied.  Id.

2         Even if the state court's ruling is contrary to or an unreasonable application of

3    Supreme Court precedent, that error justifies habeas relief only if the error resulted in "actual

4    prejudice."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  Thus, habeas relief is granted

5    only if the state court's error had a "substantial and injurious effect or influence in

6    determining the jury's verdict."  Id.

7         When applying these standards, the federal court should review the "last reasoned

8    decision" by the state courts.  Avila v. Galaza, 297 F.3d 911, 918 n.6 (9th Cir. 2002).

9    Because the California Supreme Court summarily denied relief on Petitioner's claims, this

10   Court looks to the California Court of Appeal's September 29, 2010 decision denying

11   Petitioner's direct appeal.

12        With these principles in mind regarding the standard and scope of federal habeas

13   review, the Court addresses Petitioner's claims.

14   **II.    Claims**

15        **A.    Confrontation Clause Claim**

16        Petitioner contends that the admission of Dr. Gregory Reiber's expert testimony

17   regarding the autopsy of the victim violated Petitioner's Sixth Amendment right to confront

18   witnesses because Dr. Reiber was not the doctor who performed the autopsy.  Respondent

19   argues that this claim is procedurally defaulted and, even if it were addressed on its merits, it

20   must be denied.

21             **1.    Procedural Default**

22        The state appellate court determined the claim was procedurally defaulted, as follows:

23        Doctor Brian Peterson performed an autopsy of the victim and prepared a
         report.  Peterson moved to Minnesota before defendant's trial and, to save
24       significant costs, the prosecution did not subpoena him to testify at the trial.
         Instead, the prosecution secured an agreement from defendant's attorney, in
25       advance of trial, that Dr. Reiber would review the autopsy report and testify at
         trial. . . . Defendant did not object to Reiber's testimony on Sixth Amendment
26       grounds.

27   Alejandre, 2010 WL 3772369, at *9.

28        The California Court of Appeal found that this claim was procedurally defaulted

**United States District Court**
For the Northern District of California

1   because Petitioner failed to object to Dr. Reiber's testimony at trial.  Alejandre, 2010 WL

2   3772369, at *10.  The court noted that, not only did defense counsel fail to object, but he

3   expressly agreed to allow Dr. Reiber to testify as an alternate witness.  Id.

4   The doctrine of procedural default bars a federal habeas court from reviewing a claim

5   rejected by a state court "if the decision of [the state] court rests on a state law ground that is

6   independent of the federal question and adequate to support the judgment," Coleman v.

7   Thompson, 501 U.S. 722, 729 (1991), unless the petitioner can show cause for the failure to

8   properly present the claim and actual prejudice, or that the failure to consider the claim

9   would result in a fundamental miscarriage of justice, Wainwright v. Sykes, 433 U.S. 72, 81-

10  88 (1977).  The Ninth Circuit has held that California's failure-to-object procedural bar is an

11  independent and adequate bar prohibiting federal habeas review of the claim at issue.  Rich v.

12  Calderon, 187 F.3d 1064, 1070 (9th Cir. 1999);  Vansickel v. White, 166 F.3d 953, 957-58

13  (9th Cir. 1999); Bonin v. Calderon, 59 F.3d 815, 842-43 (9th Cir. 1995).

14  Petitioner does not argue that counsel failed to object to Dr. Reiber's testimony.

15  Furthermore, he fails to show cause and prejudice for the failure to object or that failure to

16  consider the claim will result in a fundamental miscarriage of justice.  Accordingly,

17  Petitioner's Confrontation Clause claim is procedurally defaulted.

18  The state court also denied the claim on its merits and, as discussed below, that ruling

19  is not unreasonable.

20  **2.    Federal Law**

21  The Confrontation Clause of the Sixth Amendment provides that in criminal cases the

22  accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend.

23  VI.  The federal confrontation right applies to the states through the Fourteenth Amendment.

24  Pointer v. Texas, 380 U.S. 400, 403 (1965).

25  The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but

26  it is a procedural rather than a substantive guarantee.  Crawford v. Washington, 541 U.S. 36,

27  61 (2004).  It commands, not that evidence be reliable, but that reliability be assessed in a

28  particular manner: by testing in the crucible of cross-examination.  Id.  The Confrontation

Clause applies to all "testimonial" statements. Id. at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. at 51.

When the primary purpose of taking an out-of-court statement is to create an out-of-court substitute for trial testimony, the statement is testimonial hearsay and Crawford applies. Michigan v. Bryant, __ U.S.__, 131 S. Ct. 1143, 1155 (2011). See, e.g., Bullcoming v. New Mexico, ___ U.S. ___, 131 S. Ct. 2705, 2712-14 (2011) (concluding that forensic lab report, prepared in connection with a criminal investigation, certifying that petitioner's blood alcohol level was above limit for aggravated DUI was testimonial); Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310, 329 (2009); United States v. Bustamante, 687 F.3d 1190, 1194 (9th Cir. 2012) (document which in essence was an affidavit testifying to the contents of the birth records of a city is functionally identical to live, in-court testimony that an employee of city might have provided and therefore is a testimonial statement). When a substitute for trial testimony was not the primary purpose, "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." Bryant, 131 S. Ct. at 1155. The formality of the interrogation, or the lack of it, may inform the court's inquiry as to its "primary purpose." Id. at 1160.

For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury. Hernandez v. Small, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing Brecht, 507 U.S. at 637).

### 3.    Merits Analysis

Although the state appellate court found that the Confrontation Clause claim was procedurally defaulted, it also found that the claim failed because Petitioner could not show prejudice. The relevant facts, as found by the Court of Appeal, are as follows:

> Reiber testified that the victim died as a result of multiple gunshot wounds to his torso and extremities. He testified that some of the gunshot wounds were consistent with the victim standing and turning slightly to the right and others were consistent with the victim lying on the concrete. On cross-examination, Reiber acknowledged a few discrepancies between his opinions and Peterson's

United States District Court<br>For the Northern District of California

United States District Court
For the Northern District of California

1

2

opinions as expressed in the autopsy report. With respect to one of the gunshot injuries, the doctors disagreed as to which was the entry wound and which the exit wound. . . .

3

4

5

6

7

8

9

10

11

On appeal, defendant contends for the first time that the "introduction of the autopsy report and testimony relating to the autopsy that had been conducted by another doctor abridged [his] right to confrontation." The Sixth Amendment to the United States Constitution, made applicable to the states provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." As indicated above, in Crawford, 541 U.S. 36, the Supreme Court held that a defendant's Sixth Amendment right of confrontation is violated by the admission of testimonial statements of a witness not subject to cross-examination at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity for cross-examination. The court defined testimony as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact, and confirmed that the 'core class' of testimonial statements includes affidavits, custodial examinations, prior testimony not subject to cross-examination, and 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (Id. at 51-52.)

12

. . .

13

14

15

16

17

In Melendez-Diaz v. Massachusetts (2009) 557 U.S. ---- [129 S .Ct. 2527] (Melendez-Diaz ), the United States Supreme Court revisited the issue of what constitutes a "testimonial" statement. The court held that three "certificates of analysis," which showed that seized substances contained cocaine, were testimonial statements subject to Sixth Amendment protection because they were made under oath and under circumstances that would lead an objective witness to believe that the statement would be available for use at a later trial (Id. at 2532) . . .

18

Alejandre, 2010 WL 3772369, at *9-10 (footnote omitted).

19

20

The Court of Appeals then turned to whether the alleged Confrontation Clause violation would have caused prejudice.

21

22

23

24

25

26

Confrontation clause violations are subject to harmless-error analysis under Chapman v. California (1967) 386 U.S. 18, 24. (Delaware v. Van Arsdall (1986) 475 U.S. 673, 681 ["an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt"].) . . . Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Id. at 684.)

27

28

In this case, it is undisputed that the victim was shot and died as a result of multiple gunshot wounds. Insofar as the autopsy report was admitted for the purpose of establishing the cause of death, the absence of cross-examination

8

United States District Court
For the Northern District of California

1  clearly was harmless.  Defendant argues that the "autopsy report played a much
2  bigger role . . . than establishing the fact that the victim had been killed by
   gunshot."  He suggests that the prosecution used the report in closing argument
3  to establish the identity of the shooter.  Based on Reiber's testimony regarding
   the position of the victim at the time of the first gunshot, the prosecutor argued
4  that the shooter must have approached from the direction of the parked truck.
   There is no indication, however, that Peterson and Reiber disagreed as to the
5  victim's position and Reiber was available for cross-examination on this point.
   Defendant does not explain how cross-examination of Peterson would have
6  affected the credibility of this testimony.  More importantly, Reiber's testimony
   regarding the position of the victim was not based on conclusions in Peterson's
7  report.  Rather, his testimony was based primarily on photographs taken by a
   police technician, who authenticated the photographs at trial.  The autopsy
8  report was cumulative of the photographic evidence and its admission was
   harmless beyond a reasonable doubt.

9  Alejandre, 2010 WL 3772369, at 11.

10      In his federal petition, Petitioner argues that the autopsy report was prejudicial

11 because it "drew several conclusions regarding the manner in which the victim was killed,

12 which the prosecutor argued, supported its [sic] theory that [Petitioner] was the actual killer.

13 (12 Reporter's Transcript (RT)  2187-88).  As such, it is evident that the autopsy report

14 played a much bigger role in the instant case than establishing the fact that the victim had

15 been killed by gunshot." Pet'n. at 11.

16      The state court reasonably found that Dr. Reiber's testimony was not prejudicial under

17 the stringent Chapman standard of analyzing prejudice.   In federal habeas proceedings the

18 Brecht prejudicial standard applies.  Under this standard, which is not as stringent as

19 Chapman, Petitioner has not shown prejudice because, as indicated by the state court, Dr.

20 Reiber's testimony and conclusions primarily were based upon photographs taken by Police

21 Technician Galay, who testified at trial.  5 RT 870-79.   These photographs provided Dr.

22 Reiber with the necessary information to render his opinion about the nature and orientation

23 of the various bullet wounds and the position of the victim and the shooter.  Although

24 Petitioner cites Dr. Reiber's testimony at 8 RT 1318-19, which discusses the autopsy report,

25 Dr. Reiber relied on Galay's photographs for his testimony about the entry and exit wounds,

26 which he relied upon to determine the position of the shooter.  8 RT 1322, 1325-50.  Because

27 the autopsy report was cumulative to the photographic evidence, its admission did not have a

28 substantial and injurious effect or influence in determining the jury's verdict.  See Brecht, 507

U.S. at 637.  The state appellate court's ruling of no prejudice was not contrary to or an unreasonable application of <u>Brecht</u>.

**B.     Claims Regarding Gang Expert's Testimony**

Petitioner asserts that the testimony of the gang expert: (1) exceeded the scope of his expertise; (2) violated Petitioner's confrontation rights; and (3) was unduly prejudicial.  The Court of Appeal summarized the relevant facts as follows:

> Detective Palmieri testified as an expert witness on gang activity.  Palmieri had been a San Pablo Police Officer for 22 years and had been working with gang activity for more than 17 years.  His expertise on gangs was derived from his work experience, numerous training classes and interviews with over 1,000 gang members.

> Palmieri described the area around the shooting as turf claimed by Sureños, and explained the war between the Sureños and Norteños gangs.  He explained that Sureños primary activities include homicides, assaults, and drug sales, and that Sureños gain turf through acts of violence and intimidation.  Palmieri recounted several recent violent crimes committed by Sureños for the benefit of the gang.

> Palmieri described the origination and growth of the Sureños as an affiliated arm of the Mexican Mafia prison gang.  Members of the Mexican Mafia, he explained, are "more of a hard criminal" than someone who is only a Sureño.  Members of the Mexican Mafia are instructed to follow orders once released from prison, including shooting rival gang members on sight.  The Mexican Mafia forbids drive-by shootings and requires its members to "walk up to the individual you suspect as a gang member and put them down."

> Through photographs, Palmieri detailed the many tattoos on defendant's body.  Palmieri explained the meaning of tattoos in Sureño gang culture and how the tattoos indicate status or role in the gang.  The word "Richmond" across defendant's knuckles and the Roman numeral "XIII" tattooed on his hand, torso and forearm demonstrated that defendant was a Sureño.  Defendant also has the letter "M" tattooed on his hand indicating "an allegiance and respect to the Mexican Mafia."  Palmieri opined that a person with such tattoos "would be a full-fledged gang member of the Sureño gang.  You would not be allowed to even have these type of tattoos if you weren't."  Of particular interest to Palmieri was a tattoo on defendant's right arm that depicted a man pointing a gun toward the viewer.  Detective Palmieri explained, "If I was to see that on the street that would draw my attention based on my training and people that I have talked to who are gang members, this type of tattoo is indicative of someone who has been involved in shootings.  I have seen tattoos on the forearms of double-barreled shotguns, or looks like it's 3-D coming out at you, and these individuals are known and have a reputation for shooting at people."  Such a tattoo reflects the role of "an enforcer in the gang, someone who is willing to go out and do violent acts."

> Palmieri also described the different roles of gang members from "shot callers" and "OGs" to new members and affiliates.  He explained that an OG has significant experience and seniority in gang society and serves as a role model for newer gang members by teaching them how to act and initiating new

members in the ways of a Sureño.  Palmieri testified that members rise in the ranks by committing crimes for the benefit of the gang.  "So each time they got a new job and they did well they would receive more status and then they would gain respect from the gang and they would climb through the gang ranks.  It's called making your stripes."  Gangs use acts of violence to "intimidate [their] rival members and put fear into them" in order to obtain more turf.  "If you show that you can basically walk up and shoot a rival gang member . . . right there on the street in front of other rival gang members they tend not to mess with you any longer.  You tend to be the more violent dog on the street, so to speak, and then you can start chopping away and taking territory."  If the gang "can take somebody else's turf and turn it into a drug area where [they] can sell narcotics, or [they] can turn their turf into an area where [they] can steal cars . . . then [they] have just gained a foothold and an economic base."

Palmieri testified that he learned from his review of defendant's criminal records that defendant had been an active member of the Sureño gang since he was 14.  He had been convicted of a prior gang-related shooting and had served time in prison.  While in prison he was involved in an altercation between Sureño and Norteño gang members.  In forming his opinion, Palmieri also considered the fact that Garcia and Vargas had limited criminal histories.

<u>Alejandre</u>, 2010 WL 3772369, at *3-4.

## 1.    Scope of Palmieri's Expertise

In his state appeal, Petitioner argued that Palmieri's testimony regarding the Mexican Mafia and the meaning of Petitioner's tattoos exceeded the area of his expertise.  The Court of Appeal held that this claim was procedurally barred because, although Petitioner had objected at trial to Palmieri's qualification as an expert on the ground that it was too broad, he had not objected to Palmieri's specific testimony regarding the Mexican Mafia or Petitioner's tattoos.  <u>Id.</u> at *4.  As noted above, failure to object at trial is an adequate and independent procedural bar to federal habeas review.  <u>See</u> <u>Rich</u>, 187 F.3d at 1070; <u>Vansickel</u>, 166 F.3d at 957-58.  Petitioner does not argue that counsel objected to this testimony. Furthermore, he does not argue cause and prejudice for the default or that failure to consider the claim will result in a fundamental miscarriage of justice.  <u>Id.</u> at 958. Therefore, this claim is procedurally defaulted.  However, the Court of Appeal also denied it on its merits.  As discussed below, this ruling was not unreasonable.

The Court of Appeal analyzed the evidence at trial regarding Palmieri's qualifications to testify as an expert on gangs and concluded that, "Palmieri's special training and more than 17 years of experience in observing gang culture and gang activities was sufficient to

11

demonstrate the special knowledge, skill, experience and training needed to qualify him as an expert on these matters."   Alejandre, 2010 WL 3772369, at *4.

On habeas review, a state court's evidentiary rulings are not cognizable.  See 28 U.S.C. § 2254(a).  Therefore, to the extent Petitioner attacks the Court of Appeal's affirming the trial court's evidentiary rulings, the claim fails.  Furthermore, the Supreme Court case addressing qualifying expert witnesses in federal court, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), is based on a federal rule of evidence, not the Constitution.  Id. at 594–95; Moses v. Payne, 555 F.3d 742, 757-58 (9th Cir. 2009) (Supreme Court has not ruled on whether state evidentiary rules governing qualifications of experts implicates federal due process).  For that reason, California courts are not required to apply it, and in fact do not.  See People v. Leahy, 8 Cal. 4th 587, 594 (1994).  Therefore, Petitioner's claim, to the extent it is based on the assertion that his due process rights were violated by Palmieri's qualifying as an expert, also fails because no Supreme Court case addresses whether a state court's decision to qualify a person as an expert can violate a defendant's due process rights.  Accordingly, the state court's denial of this claim was not contrary to or an unreasonable application of established federal authority.

### 2.    Confrontation Rights

The Court of Appeal denied this claim as follows:

> Palmieri acknowledged that much of his knowledge and expertise about the meaning of gang tattoos was drawn from conversations with gang members over the course of his career.  Defendant raised a hearsay objection and at defendant's request the court admonished the jury as follows: "Ladies and gentlemen, much of what Detective Palmieri is describing to you is [what] he has been told by people on the street and interview[s][of] a number of gang members and so forth.  The statements that those people made to Detective Palmieri are hearsay because they are not witnesses here in court, but I'm allowing Detective Palmieri to describe those to you so that you can understand the basis of his expert opinion, what they are founded on so you can make a judgment as to credibility and reliability and give to the opinions that Detective Palmieri is giving you, you need to understand the basis of the opinions, but because the statements are out-of-court statements they can't be considered for the truth of the matters asserted because those people aren't witnesses here today."

> Defendant contends that Palmieri's opinion concerning the meaning of his tattoos violated his right to confrontation because it was based "in large part on hearsay statements from undisclosed parolees following release from prison."

Defendant acknowledges that an expert witness may rely on inadmissible evidence, including hearsay, in formulating an opinion and may testify as to the basis of his or her opinion.  He argues, however, that under Crawford v. Washington (2004), 541 U.S. 36, an expert's reliance on testimonial hearsay violates his Sixth Amendment right to confrontation.

. . .

Defendant argues that statements made in the course of Palmieri's interviews with gang members were testimonial because the purpose of Palmieri's "inquiry of gang members [is] not sociological or curious inquiry, but rather to gather information that is potentially relevant to criminal prosecutions.  Further, the gang hearsay statements are accepted as true by Palmieri and are not tested with statistical or empirical inquiry.  Thus, Palmieri is simply adopting the gang hearsay statements as true, and simply reiterating them in his capacity as a 'gang expert.'"  The Attorney General disagrees with this characterization, asserting that Palmieri's "street contacts are designed to develop a better understanding of gangs and gang behavior within the community and are not out-of-court analogs of testimony, gleaned for use in a particular trial.  They are obtained to develop an understanding of gangs and to develop and refine expertise."  We agree with the Attorney General's characterization, particularly in this instance.  Palmieri did not conduct any interviews for the purpose of gathering information for defendant's trial.  Nor did he obtain information specifically about defendant's tattoos.  Because the statements made by gang members in conversation with Palmieri were not testimonial, defendant's confrontation rights were not infringed by Palmieri's testimony.

Moreover, even if the statements could be considered testimonial, their admission did not implicate defendant's confrontation rights.  In U.S. v. Johnson (4th Cir.2009) 587 F.3d 625, 635 the court held that while "Crawford forbids the introduction of testimonial hearsay as evidence in itself, . . . it in no way prevents expert witnesses from offering their independent judgments merely because those judgments were in some part informed by their exposure to otherwise inadmissible evidence." (See also People v. Thomas (2005) 130 Cal. App. 4th 1202, 1210 ["Crawford does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions.  This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion."]; . . . The court in Johnson explained, "An expert witness's reliance on evidence that Crawford would bar if offered directly only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation.  Allowing a witness simply to parrot 'out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion' would provide an end run around Crawford. [Citation.] For this reason, an expert's use of testimonial hearsay is a matter of degree. [Citations.] The question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay.  As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no Crawford problem. The expert's opinion will be an original product that can be tested through cross-examination." (U.S. v. Johnson 587 F.3d. at 635).

| | |
|---|---|
| | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

  In this case, Palmieri was not merely a transmitter of testimonial hearsay.  He offered an interpretation of defendant's tattoos based on information he had gathered though numerous conversations with gang members over the course of his career.  Defendant was able to cross-examine Palmieri regarding his opinion and the jury was able to judge the credibility of his opinion in light of source of his foundational information.

Alejandre, 2010 WL 3772369, at *5-6.

The statements Palmieri was told by gang members do not qualify as testimonial under Crawford and its progeny.  As indicated by the state court, Palmieri's job was to learn about gang culture, structure and sociology and, as part of that job, he spoke to many gang members.  9 RT 1623-26; 1637-40.  No evidence indicated that Palmieri gathered these statements as part of a specific investigation or that any of the individuals to whom Palmieri spoke had the purpose of establishing or proving a fact for possible use in a criminal trial.  As further indicated by the state appellate court, Palmieri did not merely transmit the information he gathered; he interpreted the evidence based on information gathered from numerous conversations with gang members over the seventeen years of his career.  See e.g., 10 RT 1708-15.  Therefore, the state court's conclusion that Crawford did not apply was not contrary to or an unreasonable application of clearly established federal authority or an unreasonable determination of the facts in light of the state court record.

### 3.    Palmieri's Testimony About Petitioner's Tattoos

Petitioner contends that the trial court erred in allowing Palmieri to testify about the significance of Petitioner's gang tattoos and his connection to the Mexican Mafia.  He argues that this evidence should not have been admitted because it was improper profile evidence and because it had an inflammatory impact on the jury.

### a.    Federal Law

The Due Process Clause guarantees the fundamental elements of fairness in a criminal trial.  Estelle v. McGuire, 502 U.S. 62, 70 (1991).  However, the admission of evidence that is relevant to prove an issue in the case does not violate due process.  Id.  The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair

14

United States District Court
For the Northern District of California

trial guaranteed by due process.  <u>Henry v. Kernan</u>, 197 F.3d 1021, 1031 (9th Cir. 1999).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)).

Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  <u>Henry</u>, 197 F.3d at 1031; <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991).  While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness.  <u>Id.</u>  The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  <u>Walters v. Maass</u>, 45 F.3d 1355, 1357 (9th Cir. 1995).   But only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.  <u>Jammal</u>, 926 F.2d at 920.

### b.     State Court Analysis

The Court of Appeal addressed this claim as follows.  It explained that profile evidence, which is a collection of conduct and characteristics commonly displayed by those who commit a certain crime, is generally inadmissible to prove guilt because it has the potential of including innocent people as well as the guilty within the profile.  <u>Alejandre</u>, 2010 WL 3772369, at *7.  In other words, profile evidence improperly invites the jury to conclude that, because the defendant manifested certain characteristics, he committed a crime.  <u>Id.</u>  However, profile evidence is only inadmissible when the conduct or matter that fits the profile is as consistent with innocence as with guilt.  <u>Id.</u>  The court noted that evidence of a gang's territory, membership, signs, symbols, beliefs, practices, criminal

enterprises, rivalries and other such gang characteristics is relevant to proving identity, motive, modus operandi, intent, means of applying force or fear and other issues pertinent to whether the defendant is guilty of the charged crime.  Id. at *8.

Under this standard, the court found that "Defendant's tattoos are a public statement that he is willing to commit extreme violence on behalf of his gang and is relevant to show defendant's motive.  Defendant's tattoo of the letter 'M,' especially in light of his exposure to the Mexican Mafia in prison, supports a reasonable inference that he was affiliated with that arm of the gang as well.  Thus, Palmieri's testimony regarding the Mexican Mafia also was probative of defendant's motive and the specific intent to benefit the gang."  Id.  The court also found that it was

> unlikely the testimony regarding the meaning of defendant's tattoos or his potential connection to the Mexican Mafia would have evoked an improper emotional reaction from the jury.  Defendant's gang affiliation was established through other substantial admissible evidence.  In light of the other evidence, the evidence to which defendant objects is not particularly inflammatory.  As the court observed in People v. Leon, (2009) 181 Cal. App. 4th 452, 462, "A defendant charged with committing a crime for the benefit of a criminal street gang has no entitlement to an antiseptic portrayal of himself.  If he elects to portray himself as a killer before he commits a murder, he should not be able to have what is tantamount to a 'name change' thereafter."

Id.

Palmieri's testimony regarding Petitioner's tattoos and association with the Mexican Mafia was relevant to show Petitioner's gang involvement for purposes of proving the gang enhancement.  Thus, under established federal law, its admission did not violate Petitioner's due process rights.  See Jammal, 926 F.2d at 920 ("only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process").  The Court of Appeal's denial of this claim was not contrary to or an unreasonable application of Estelle, 502 U.S. at 67.

**C.     Petitioner's Prior Criminal History**

Petitioner argues that the trial court erred, under California Code of Evidence section 1101(b),  in admitting his prior criminal history to show motive and intent because it was

improperly used to establish Petitioner's identity as the shooter.[1]

The Court of Appeal provided the relevant facts to this claim and noted that the trial court gave a limiting instruction to the jury on the use of this evidence.

Prior to trial, the prosecution filed a motion requesting admission of defendant's prior conviction for assault with a firearm for the limited purpose of proving motive, intent, or gang purpose with respect to the current offense. According to the police reports of the prior incident, several Norteño gang members were standing in a store when someone yelled "Norte, Norte." Defendant, who was in the driver's seat of a car outside the store, pulled out a gun and began firing from the car into the store, hitting one of the individuals inside. Defendant plead guilty to assault with a firearm, and admitted an enhancement that the shooting was for a gang related purpose.

The court agreed that the prior was admissible to demonstrate defendant's motive, intent, and the specific intent to benefit the criminal street gang. The court found the prior incident to be very similar to the current offense in showing motive and gang intent, given that defendant shot at a group of individuals for no reason other than that they belonged to the rival gang. The court found that the evidence was probative because the prior conviction resulted from defendant's guilty plea and the passage of time between the offenses was not significant given that defendant spent nearly all the intervening time in custody and committed the current offenses soon after his release from prison. The court noted the potential for undue prejudice was minimal because the jury would learn independently that defendant was a convicted felon and that he was a member of a gang. To reduce the potential prejudice, the court directed that evidence of the prior crime be admitted through the testimony of the expert witness rather than by the testimony of the victim. Consistent with the court's ruling, testimony was offered that defendant "and another gang member were involved in a shooting of a rival gang member in order to benefit and further the Sureño criminal street gang, and that the victim in that case did not die."

At the close of trial, the court instructed the jury that "[e]vidence has been introduced for the purpose of showing that the defendant committed crimes other than those for which he is on trial. . . . This evidence, if believed, may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining if it tends to show the existence of the intent which is a necessary element of the crime charged, a motive for the commission of the crime charged, that the crime or crimes charged were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."

---

[1]California Evidence Code section 1101(a) prohibits the admission of "evidence of a person's character or a trait of his or her character . . . when offered to prove his or her conduct on a specified occasion." Subsection (b) provides, "[n]othing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Defendant contends that despite the court's admonition, his prior conviction was improperly used to prove identity. He suggests that identity, rather than motive or intent, was "the primary issue in this case" and that the evidence of his prior conviction was "a thinly-veiled directive to the jury that [defendant] was the likely shooter because he had the more likely propensity to commit the instant crime." Defendant suggests that the admission of this evidence was particularly prejudicial because the jury was also presented with evidence that Vargas and Garcia did not have a record of involvement in prior gang-related shootings. However, the danger that the jury considered the evidence for an improper purpose is no different here than in any other case in which evidence is admitted for a limited purpose. Moreover, that risk was reduced by the court's admonition regarding the proper uses for the evidence and we must presume the jury followed that instruction. . . .

Defendant's suggestion that his prior criminal conviction was irrelevant if not admitted to establish identity goes too far. The evidence was clearly relevant to show defendant's motive for the crime and that the crime was committed for the benefit of the gang.

Defendant also contends that even if this evidence was not inadmissible under Evidence Code section 1101, the court abused its discretion in failing to exclude it under Evidence Code section 352. . . . Defendant argues that the evidence was of limited probative value because defendant's alleged motive could have been ascertained from other gang evidence and that the potential for prejudice was great because "there was the very high risk that the jury would use this evidence to discern [defendant's] identity as the perpetrator because of what amounts to propensity evidence." As set forth above, the court recognized the potential prejudice and attempted to minimize that risk by admitting a sanitized version of the events and by admonishing the jury. We cannot say that under these circumstances the court abused its discretion in admitting this evidence.

Alejandre, 2010 WL 3772369, at 12-13.

As noted above, under federal law, due process is violated by the improper admission of evidence only if there are no permissible inferences the jury may draw from the evidence. Jammal, 926 F.2d at 920. Here, the admission of Petitioner's prior crime was relevant to proving intent and motive. Furthermore, the limiting instruction that the trial court gave the jury obviated any concern that the evidence would be improperly used to establish identity. See Weeks v. Angelone, 528 U.S. 225, 234 (2000); Richardson v. Marsh, 481 U.S. 200, 206 (1987) (jury is presumed to follow its instructions); Doe v. Busby, 661 F.3d 1001, 1017 (9th Cir. 2011) (habeas court must presume that jury follows instructions it was given.)

Therefore, the Court of Appeal's conclusion that the jury was not likely to misapply the evidence of Petitioner's prior crime, in light of the limiting instruction, is not an unreasonable application of Weeks and Richardson and its conclusion of no due process

18

1   violation is not an unreasonable application of Estelle, 502 U.S. at 67.

2       **D.      Accomplice Testimony**

3       Petitioner contends that there was insufficient evidence to support his conviction of

4   first degree murder or of conspiracy to commit an assault because Vargas and Garcia are

5   accomplices to the murder and, as such, under California Penal Code section 1111, there was

6   insufficient evidence to corroborate their testimony.

7       Section 1111 provides, in relevant part: "A conviction can not be had upon the

8   testimony of an accomplice unless it be corroborated by such other evidence as shall tend to

9   connect the defendant with the commission of the offense. . . ."

10      The Court of Appeal denied this claim as follows:

11      Garcia and Vargas testified that defendant put the gun under his seat and the
        arresting officer confirmed that when she asked defendant to step out of the car
12      she noticed the gun protruding from under the seat in which defendant had
        been sitting.  Defendant argues that the officer's testimony is insufficient
13      corroboration because it "suggests at a minimum, joint possession with both
        Vargas, the owner of the truck, and Garcia, within easy hand's reach of the
14      weapon" and "does nothing to eliminate [Vargas or Garcia] as the possible
        shooters."  Section 1111 does not require, however, that the corroborating
15      evidence eliminate the accomplice's potential guilt, but only that it tend to
        connect the defendant to the crime. . . . The officer's testimony in this case
16      sufficiently meets this standard.

17   Alejandre, 2010 WL 3772369, at *14.

18      The Due Process Clause "protects the accused against conviction except upon proof

19   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

20   charged."  In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

21   evidence in support of his state conviction cannot be fairly characterized as sufficient to have

22   led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a

23   constitutional claim, see Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven,

24   entitles him to federal habeas relief, see id. at 324.  However, "Jackson claims face a high bar

25   in federal habeas proceedings . . ." Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012) (per

26   curiam).

27      A federal court reviewing collaterally a state court conviction does not determine

28   whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v.

United States District Court
For the Northern District of California

Borg, 982 F.2d 335, 338 (9th Cir. 1993).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. at 338 (quoting Jackson, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation.  Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.

The Ninth Circuit has specifically addressed section 1111 in the context of habeas proceedings and has held that it is "a state statutory rule, and to the extent that the uncorroborated testimony is not 'incredible or insubstantial on its face,' the rule is not required by the Constitution or federal law."  Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000) (citation omitted).

Thus, under federal law, to the extent that the testimony of Vargas and Garcia was not incredible or insubstantial on its face, it must be considered whether or not it is corroborated.

Vargas testified that, on the night of February 2, 2007, he was driving a truck with Petitioner and Garcia as passengers, when they saw a "chap," that is, a person who was in the rival Sureno gang.  6 RT at 960.  Petitioner told him to "stop right here.  I'll be right back."  6 RT at 960.  Vargas pulled over to the corner and Petitioner got out of the car and walked in the direction where they had seen the "chap."  6 RT at 961, 964.   When Petitioner did not come back right away, Vargas asked Garcia to see what happened to Petitioner, but before Garcia could respond, they heard gunshots.  6 RT at 965-66.  Then Garcia grabbed two beer bottles and went in the direction Petitioner had gone.  6 RT at 965.  When Garcia got to the corner, he threw the bottles and started screaming, saying, "Uncle, what happened, what happened?"  6 RT at 967.  Garcia and Petitioner walked back to the truck together and told Vargas to drive toward Hercules.  6  RT at 970.  Later that evening, the three were driving in Hercules and Vargas got pulled over by the police.  6 RT at 974. Petitioner "threw the gun on the floor," when the police were asking Vargas for his registration.  6 RT at 975.

Garcia testified that, on the evening of February 2, 2007, he and Petitioner were passengers in a truck driven by Vargas.  6 RT at 1097-98.   When they got to Broadway and

11th Street, they saw "a kid walking toward that street and Juan said . . . there was a kid wearing red." 6 RT at 1098. Then Petitioner told Vargas to make a U-turn. 6 RT at 1102. Vargas made a U-turn and parked the truck. 6 RT at 1103. Petitioner got out of the truck, walked toward the kid in red and then Garcia heard gunshots. 6 RT at 1107. When they were back in the truck, Garcia asked Petitioner "why you did that?" but Petitioner did not answer. 6 RT at 1112. Petitioner gave Garcia an empty magazine. 6 RT at 1113. Later that night, when they were driving again, they were stopped by the police and Petitioner put the gun on the floor, next to Garcia's feet. 7 RT at 1149. After Garcia was arrested, he took the police to the scene of the crime and described where the truck had parked and where Petitioner had walked from the truck. 7 RT at 1130-31. Garcia's description to the police was video-taped and the tape was played during his testimony. 7 RT at 1130-35

The testimony of Vargas and Garcia clearly was not incredible or insubstantial on its face. Therefore, it must be considered in evaluating the sufficiency of the evidence. Under Jackson, the testimony identifying Petitioner as the shooter, when viewed in the light most favorable to the prosecution, is more than sufficient to support the conclusion that any rational trier of fact would have found beyond a reasonable doubt the essential elements of the crimes of first degree murder and conspiracy to commit an assault.

Therefore, the Court of Appeal's denial of this claim was not contrary to or an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts in light of the state court record.

**E.      Sufficiency of Evidence to Support Gang Enhancement**

Petitioner claims that, under California Penal Code section 186.22(b)(1), the evidence was insufficient to support the gang enhancement. Section 186.22(b)(1) provides a sentence enhancement for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." Petitioner contends that the only evidence that his crime was gang-related is Palmieri's testimony that a gang gains turf through street terrorism, and killing in front of one's own gang members earns the

killer respect and status in the gang.  He argues this is insufficient to show that he committed the crime for the benefit of the gang.  The state court record shows this claim must be denied.

At trial, the gang expert testified about the gang purpose underlying a gang member's commission of a murder, which is to intimidate and eliminate rivals, control turf and educate and indoctrinate younger members in the gang culture.  It also establishes the murderer as a hardcore gang member and increases his status in the gang.  9 RT at 1665-66; 1672-74; 1678-79; 1681; 10 RT 1088-89.  Palmieri explained that killing a rival Norteno gang member in front of other Surenos increased the killer's status as a Sureno, is a means to moving up quickly in the ranks and keeps fellow gang members in line.  9 RT 1681-83.  He stated that Surenos are at war with Nortenos and a Sureno gang member is obligated to attack a Norteno who is alone on the street.  9 RT 1660-61; 10 RT 1694, 1722-26; 1746-47; 1888-89.  Palmieri opined that a shooting, under the circumstances of this case, would be for the benefit of the Sureno gang.  10 RT 1888-89.

Additionally, the testimony of Garcia and Vargas demonstrates that the victim was targeted solely because he wore the color red and, thus, was thought to be a Norteno gang member.  Vargas testified that someone pointed out that the victim was a "chap," which, he explained, is somebody that "bangs red," and these people are enemies of Surenos.  6 RT 959-60; 1005.  Vargas also described the victim as "flamed up," which means wearing red Norteno gang colors.  6 RT 962, 1009.  As discussed previously, Vargas and Garcia both recounted that, after they noticed the victim, Petitioner told Vargas to make a U-turn in the direction of the victim, Petitioner got out of the car and walked in the direction of the victim, and then Garcia and Vargas heard shots fired.

The Court of Appeal found this evidence sufficient to show that Petitioner committed the murder for the benefit of his gang.

> [S]ubstantial  evidence establishes that defendant committed this crime for the benefit of the gang and for the specific intent of promoting this and other criminal conduct.  In People v. Vazquez, 178 Cal. App. 4th at 353, the court held that a reasonable jury could infer, based on expert testimony, that "violent crimes such as this murder increase 'respect' for the gang and facilitate its criminal activities by intimidating members of rival gangs and law-abiding neighborhood residents . . .  and other evidence in the record, that appellant

United States District Court

For the Northern District of California

1
2
3
4

> intended for the Lopez murder to have the predicted effect of intimidating rival gang members and neighborhood residents, thus facilitating future crimes committed by himself and his fellow gang members."  The same inference could reasonably be made in the present case based on Palmieri's testimony and the testimony of Vargas and Garcia that the victim was a "chap" and should be shot because he was wearing the color red.

Alejandre, 2010 WL 3772369, at *15.

5
6
7

The Court of Appeal's ruling that this evidence was sufficient to support the gang enhancement was not contrary to or an unreasonable application of Jackson, 443 U.S. at 319.

8

### F.      Griffin Error

9
10
11
12
13
14

Petitioner argues that the trial court erred in allowing admission of evidence that he had been arrested on the night of the murder because this suggested that he should have remembered where he was at the time of the murder and should have been able to provide an alibi.  Petitioner contends that the prosecutor's use of this evidence in his closing argument to question Petitioner's lack of an alibi constitutes a violation of Griffin v. California, 380 U.S. 609, 614 (1965).

15

#### 1.      Federal Law

16
17
18
19
20
21
22
23
24
25
26
27

Griffin error occurs, and a defendant's privilege against self-incrimination is violated, where a prosecutor asks the jury to draw an adverse inference from a defendant's silence or to treat the defendant's silence as substantive evidence of guilt.  Griffin, 380 U.S. at 615. Although it is proper for the prosecution to address the defense arguments, a comment is impermissible if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify.  Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987) (citing United States v. Bagley, 772 F.2d 482, 494 (9th Cir. 1985)).   Even if the prosecutor's statements violate Griffin, "[r]eversal is warranted only where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for the conviction, and where there is evidence that could have supported acquittal."  Hovey v. Ayers, 458 F.3d 892, 912 (9th Cir. 2006) (quotation and citation omitted).

28

United States District Court
For the Northern District of California

2.    **Factual Background**

The Court of Appeal summarized the facts relevant to this claim as follows:

> Prior to trial, the prosecutor sought, over defendant's objection, to introduce evidence of the fact that defendant was taken into custody three hours after the shooting and remained in custody since that time.  The prosecutor explained that this fact was relevant to rebut any argument by the defense that defendant would not be able to remember that particular evening over a year ago and, thus, would not be able to identify and call an appropriate alibi witness.  The court deferred ruling on the defense objection, indicating it would take the matter up with the parties over the lunch hour.  Although no ruling on the evidentiary objection appears on the record, the fact that defendant remained in custody since the time of the shooting was ultimately introduced by way of stipulation .

Alejandre, 2010 WL 3772369, at *15.

The issue of Petitioner's lack of an alibi was brought up by defense counsel in his closing argument.  He argued that the distance from Petitioner's house to the scene of the crime was only a few blocks, so that to provide an alibi Petitioner would have to account for his whereabouts for a twenty-minute increment of time, which would be difficult for anyone to do.  12 RT 2171-72.

In his rebuttal, the prosecutor responded to this by arguing:

> You know, if I asked you where you were on February 2nd, 2007, you wouldn't know, that was just another random day.  Maybe you could say you were in Buffalo or Florida.  But, ladies and gentlemen, if I asked you where you were on the day you were taken into custody and you never got out again?  You would remember.  You would remember that night.
>
> . . .
>
> The defendant would remember where he was on February 2nd and 3rd, 2007, because it is a pretty important day for him.  He went into custody, he went to jail, and he hasn't got out since.  That is an incredibly important fact.  Don't fall for the turn, that well none of us can really remember where we were or it's a short 20 minutes, because there is evidence of neither.
>
> . . .
>
> Where were the witnesses to come and say, no, no, no, I was with Ramon Alejandre that night.  He didn't go anywhere, and he didn't leave.
>
> The burden is mine to prove this case beyond a reasonable doubt, but by the same token I am allowed to comment to call [sic] necessary and logical witnesses, and you are allowed to consider it.  That is a part of the law that we have, that is a part of criminal jurisprudence.  You are allowed to consider those facts, that there were no alibi witnesses.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

> The defense attorney said why didn't Mr. DeFerrari call witnesses to say, oh, I saw Robert Garcia and Juan Vargas and Mr. Alejandre at the party or I saw them at the party before or any of those things? That's the least of his concerns. Why didn't he call alibi witnesses, or a witness to say where his client was. Because they don't exist.

12 RT 2190-92.

The Court of Appeal held that the prosecutor's argument was proper rebuttal to the defense counsel's explanation for the absence of an alibi witness and, thus, did not infringe on Petitioner's right to remain silent.   Alejandre, 2010 WL 3772369, at *16.

### 3.     Analysis

The state appellate court's decision was reasonable.  In his closing argument, defense counsel raised the issue of Petitioner's lack of an alibi, thereby inviting the prosecutor to respond.  See Bagley, 772 F.2d at 494 (prosecutor may properly respond to arguments made by defense counsel so long as his remarks are not manifestly intended to call attention to defendant's failure to testify).   The prosecutor's comments were directed at the absence of alibi witnesses as a rebuttal to the defense argument; the remarks did not manifestly call attention to Petitioner's failure to testify.  Furthermore, there was no prejudice because the prosecutor's comments were brief and Petitioner points to no evidence that could support acquittal.  See Hovey, 458 F.3d at 912.  Additionally, any error was minimized by the trial court's instructions to the jury that the prosecutor's comments are not evidence, that the defendant has a right not to testify and that the jury must not draw any inference from the fact that the defendant did not testify.  11 RT at 2016, 2025.  Accordingly, Petitioner's claim does not warrant habeas relief.

### G.     Exclusion of Inflammatory Photograph

### 1.     Relevant Facts

Petitioner contends that the trial court violated his right to present a defense and to confront witnesses when it prevented him from introducing a photograph of Vargas's baby wearing a gang rag on his head and a gun placed into the top of his diaper.  The defense argued that this and other photographs of Vargas making gang signs were relevant to impeach Vargas's testimony that he had ended his affiliation with the Sureno gang.  6 RT

United States District Court
For the Northern District of California

1055-56.  The prosecutor objected to the photograph of Vargas's baby as unduly

inflammatory and more prejudicial than probative.  6 RT 1055-56.  The court excluded the

photograph of the baby, explaining that it "has nothing to do with Vargas's credibility.  It is

likely to cause the jury to be inflamed by the fact that the baby has a gun in his diaper.  The

diaper has nothing to do with his testimony or his credibility and it is, in my opinion, unfairly

prejudicial and doesn't have any probative value.  So, I'm going to exclude B and permit you

to cross him with A through E, excluding B, which amply show . . . apparent gang signs and

tattoos and other evidence that is contrary to his actual testimony that he is not a member of

the Surenos."  6 RT 1061.  In addition to the photographs, Petitioner was allowed to

introduce evidence that Vargas had "tagged" the interior of a shed on his property with gang

signs and symbols in blue paint, 10 RT 1864-66, and a blue belt and blue bandana the police

had seized from Vargas's bedroom during a search, 10 RT 1856-59.  The defense also

introduced, by way of stipulation, evidence that, after Vargas testified at Petitioner's

preliminary hearing, he received a plea deal reducing his murder charge to a charge of being

an accessory after the fact and dismissing pending misdemeanor charges of receiving stolen

property and driving a stolen vehicle.  10 RT 1885.

The Court of Appeal held that the trial court's evidentiary ruling "did not interfere

with [Petitioner's] constitutional rights to present a defense or confront the witnesses against

him.  As the court noted, the other photographs . . .  provided ample opportunity to impeach

Vargas's testimony."  Alejandre, 2010 WL 3772369, at *16.

### 2. Analysis

#### a. Due Process Claim

"[S]tate and federal rulemakers have broad latitude under the Constitution to establish

rules excluding evidence from criminal trials."  Holmes v. South Carolina, 547 U.S. 319, 324

(2006) (citations omitted); see also Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (due process

does not guarantee a defendant the right to present all relevant evidence).  But this latitude is

limited by a defendant's constitutional rights to due process and to present a defense, rights

originating in the Sixth and Fourteenth Amendments.  Holmes, 547 U.S. at 324.  Due process

is violated only where the excluded evidence had "persuasive assurances of trustworthiness" and was critical to the defense.  Chambers v. Mississippi, 410 U.S. 284, 302 (1973).

Here, Petitioner was not offering the photograph in support of his defense, but to impeach a prosecution witness.   Because this evidence was not "critical to the defense," Petitioner's due process right was not violated when the court excluded it.  Most importantly, the one excluded photograph was cumulative to the other photographs that were admitted.  Therefore, even if impeachment of Vargas was critical, the exclusion of one photograph out of many did not affect Petitioner's ability adequately to impeach him.  The Court of Appeal's rejection of Petitioner's due process claim was not unreasonable.

**b.     Confrontation Clause Claim**

The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.  Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam).  Accordingly, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).  Generally speaking, a court violates the Confrontation Clause only when it prevents a defendant from examining a particular and relevant topic.  Fenenbock v. Director of Corrections, 692 F.3d 910, 919 (9th Cir. 2012).   Such limitations are proper as long as the cross-examination is sufficient to allow the jury to evaluate "the biases and motivations of the witness." Evans v. Lewis, 855 F.2d 631, 633-34 (9th Cir. 1988) (citation omitted).

The trial court excluded only one photograph while permitting the defense to introduce four other photographs as well as substantial additional evidence that demonstrated Vargas's potential gang membership for impeachment purposes.  The excluded photograph was repetitive of the other impeachment evidence and the remaining impeachment evidence was sufficient to allow the jury to evaluate Vargas's biases and motivations.  Thus, under established federal authority, there was no Confrontation Clause violation and the Court of

27

1    Appeal's rejection of this claim was not unreasonable.

2        **H.    Flight Instruction**

3        Petitioner challenges the trial court's decision to give CALJIC No. 2.52 which

4    instructs the jury that "The flight of a person immediately after the commission of a crime, or

5    after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact

6    which, if proved, may be considered by you in the light of all other proved facts in deciding

7    whether a defendant is guilty or not guilty."   He argues that this instruction lowered the

8    prosecution's burden of proof because it created a presumption of guilt for which there was

9    an inadequate factual basis.

10       The California Court of Appeal analyzed this claim as follows:

11       "In general, a flight instruction 'is proper where the evidence shows that the
         defendant departed the crime scene under circumstances suggesting that his
12       movement was motivated by a consciousness of guilt.' [Citation.]   "[F]light
         requires neither the physical act of running nor the reaching of a far-away
13       haven. [Citation.] Flight manifestly does require, however, a purpose to avoid
         being observed or arrested."  [Citations.] "Mere return to familiar environs
14       from the scene of an alleged crime does not warrant an inference of
         consciousness of guilt [citations], but the circumstances of departure from the
15       crime scene may sometimes do so." (People v. Bradford (1997) 14 Cal.4th
         1005, 1055.) "To obtain the instruction, the prosecution need not prove the
16       defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury
         could find the defendant fled and permissibly infer a consciousness of guilt
17       from the evidence." (People v. Bonilla (2007) 41 Cal.4th 313, 328.)

18       At trial, one witness testified that she heard a truck idling outside her window
         prior to the shooting and immediately after the gunshots heard someone yell
19       "hurry up, hurry up." Then she heard the truck drive away "fast." A second
         witness confirmed that she also heard someone say "hurry up" and that the
20       truck left the area "faster than usual." This evidence is sufficient to support the
         instruction.

21
22   Alejandre, 2010 WL 3772369, at *17.

23       The formulation of jury instructions is a question of state law and is not cognizable in

24   habeas proceedings. Estelle, 502 U.S. at 67-68. A faulty jury instruction will constitute a

25   violation of due process only where the instruction by itself infects the entire trial to such an

26   extent that the resulting conviction violates due process. Hendricks v. Vasquez, 974 F.2d

27   1099, 1106 (9th Cir.1992) (citing Cupp v. Naughten, 414 U.S. 141, 147 (1973)). Whether a

28   constitutional violation has occurred will depend upon the evidence in the case and the

United States District Court
For the Northern District of California

28

**United States District Court**
For the Northern District of California

overall instructions given to the jury.  <u>Duckett v. Godinez</u>, 67 F.3d 734, 745 (9th Cir. 1995).

Under this federal authority, the California Court of Appeal's rejection of this claim was not unreasonable.  As noted by the Court of Appeal, there was evidence that a witness heard a truck idling outside her window and, after she heard shots fired, she heard someone say "hurry up, hurry up," before the truck left the area faster than usual.  5 RT 801-02.  There was also evidence that, after the shooting, Vargas drove to Hercules instead of continuing on the quest to buy beer at a nearby market, 6 RT 1030; 1113-14 and that Petitioner, Vargas and Garcia remained in Hercules where they were arrested three hours after the murder,  6 RT 1035-39; 7 RT 1043-45.  This evidence is sufficient for the jury to find that Petitioner fled the scene and to infer consciousness of guilt from this action.  Because the instruction was not improper, no due process violation occurred.  Even if it were improper, there is no evidence that it infected the trial to such an extent that due process was violated.

Furthermore, other district courts have considered and rejected Petitioner's argument that this flight instruction lowered the prosecution's burden of proof by creating a presumption of guilt.  <u>See</u> <u>Toledo v. Adams</u>, 2010 WL 1813785, *9 (C.D. Cal. Feb. 9, 2010); <u>Delgado v. Yates</u>, 622 F. Supp. 2d 854, 860 (N.D. Cal. 2008).  The California Supreme Court has also held that this instruction does not lower the prosecution's burden of proof.  <u>People v. Boyette</u>, 29 Cal. 4th 381, 438-39 (2002) .  Thus, the California Court of Appeal's rejection of this claim was not unreasonable.

### III.    Prejudice

Respondent argues that, even if there were constitutional errors, Petitioner has failed to prove prejudice.  Under established Supreme Court authority, a habeas petitioner is not entitled to relief unless the trial error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  <u>Brecht</u>, 507 U.S. at 637-38.  In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." <u>Id.</u>

Here, overwhelming evidence pointed to Petitioner's guilt.  First, forensic evidence established that the gun found under Petitioner's seat in the truck was the gun used to shoot

United States District Court
For the Northern District of California

1    the victim.  9 RT at 1492-98; 1505-07.  Second, the testimony of Garcia and Vargas placed

2    them and Petitioner at the scene of the crime at the time of the shooting.  6 RT at 958-60;

3    1093-98.  Third, they testified that, after they spotted the victim who was identified as a

4    Sureno, Petitioner ordered Vargas to turn the truck around to go toward the victim, that

5    Vargas followed Petitioner's order and then parked the truck, that Petitioner got out of the

6    truck, walked in the direction of the victim, and after a few minutes they heard a series of

7    shots.  6 RT at 959-67; 1098-1113.  Fourth, gang expert Palmieri testified that Petitioner's

8    tattoos indicated that he was a member of the Sureno gang, 10 RT at 1700-15, and that

9    Sureno gang culture encouraged the shooting of rival gang members.  RT at 1722-25; 1728-

10   39.  Fifth, the defense case, which primarily consisted of discrediting the testimony of Vargas

11   and Garcia, was weak.  12 RT 2137-53 (defense closing argument).

12        As discussed above, the Court has found that there were no constitutional violations

13   and that the Court of Appeal reasonably denied Petitioner's claims.  However, because the

14   prosecution's case against Petitioner was strong, with overwhelming evidence pointing to

15   Petitioner's guilt, even had there been constitutional violations, they would not have had a

16   substantial or injurious effect or influence on the jury's verdict.  For this reason also,

17   Petitioner's claims for habeas relief are denied.

18                                          **CONCLUSION**

19        For the reasons set out above, the Court of Appeal's denial of Petitioner's claims was

20   not contrary to or an unreasonable application of established federal authority or an

21   unreasonable determination of the facts in light of the state court record.  Accordingly, the

22   petition is DENIED.

23        A certificate of appealability is DENIED because petitioner has not demonstrated that

24   "reasonable jurists would find the district court's assessment of the constitutional claims

25   debatable or wrong." See Slack v. McDaniel, 529 U.S. 473, 484 (2000).

26

27

28

The clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED:   April 18, 2013

_____
CHARLES R. BREYER
United States District Judge